## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GLORIA BAILEY,** *Personal Representative of* THE ESTATE OF BOBBY LEE RIMMER, *deceased,* | ) ) ) ) | |
| **PLAINTIFF,** | ) ) ) | **CIVIL ACTION NO.** |
| *-vs-* | ) ) ) | **HON.** **MAGISTRATE** |
| **UM HEALTH,** *d/b/a Metro Health, Metro Health Corporation, and/or Metro Health – University of Michigan Health,* AND **METROPOLITAN HOSPITAL,** *a/k/a and d/b/a Metro Health, Metro Health – University of Michigan Health, Metro Health Hospital, UMH-West – Hospital, and/or University of Michigan Health – West, Jointly and Severally,* | ) ) ) ) ) ) ) ) ) ) ) | |
| **DEFENDANTS.** | ) ) | |

ALBERT J. DIB, ESQ. (P32497)
LEANNE PREGIZER (P83777)
**JEFFERSON LAW CENTER**
*Attorneys for Plaintiff*
JEFFERSON LAW & FINANCE BLDG
25615 Jefferson Ave.
St. Clair Shores, MI 48081
(586) 270-4010; FAX: 4011
(248) 672-9854 [MOBILE]
adib@jeffersonlawcenter.com
lpregizer@jeffersonlawcenter.com
www.jeffersonlawcenter.com

## COMPLAINT

### JURY DEMAND

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the Complaint.*

*/s/ Albert J. Dib*

**ALBERT J. DIB, ESQ. (P32497)**

NOW COMES the above-named plaintiff herein, GLORIA BAILEY, *Personal Representative of the Estate of,* BOBBY LEE RIMMER, *deceased,* by and through her attorneys at JEFFERSON LAW CENTER, *by*: ALBERT J. DIB, *Attorney/Director*, and for her cause of action against the defendants UM HEALTH, *d/b/a Metro Health, Metro Health Corporation, and/or Metro Health – University of Michigan Health*, AND METROPOLITAN HOSPITAL, *a/k/a and d/b/a Metro Health, Metro Health – University of Michigan Health, Metro Health Hospital, UMH-West – Hospital, and/or University of Michigan Health – West, jointly and severally*, states as follows:

## JURISDICTION AND VENUE

1.     This action for violations of 42 USC §1395dd *et seq.*, known as the EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT [**"*EMTALA*"**], seeks damages in excess of **TWENTY-FIVE MILLION DOLLARS** ($25,000,000.00) to compensate the Estate of Bobby Lee Rimmer, *deceased*, for the permanent harm, injuries, and damages inflicted upon Bobby Lee Rimmer, *deceased* ("*Mr. Rimmer*") and his Estate by Defendants.

2.     Plaintiff's decedent, Bobby Lee Rimmer ("*Mr. Rimmer*") died on April 11, 2021, in Gaines Township, Kent County, Michigan. The Kent County Probate Court issued Letters of Authority appointing Mr. Rimmer's surviving daughter, Gloria Bailey, as Personal Representative of the Estate of Bobby Lee Rimmer, *deceased*.

3.     Plaintiff's decedent was a resident and citizen of Michigan. Moreover, Plaintiff's Personal Representative is a resident and citizen of Michigan.

4.    Plaintiff's Personal Representative, Gloria Bailey, therefore, brings this action on behalf of, and in her representative capacity as the Personal Representative of the Estate of Bobby Lee Rimmer, *deceased*, her late father.

5.    The wrongdoing complained of herein, occurred in Michigan. Jurisdiction is proper in this Court, as this claim presents a Federal question pursuant to 42 USC §1395dd *et seq*. Venue is proper in the Western District of Michigan under 28 USC §1391(b) and (c).

6.    Defendants UM Health, *d/b/a Metro Health, Metro Health Corporation, and/or Metro Health – University of Michigan Health*, and Metropolitan Hospital, *a/k/a and d/b/a Metro Health, Metro Health – University of Michigan Health, Metro Health Hospital, UMH-West – Hospital, and/or University of Michigan Health – West* [collectively, "*Metro Health*"] are Michigan corporations that are located and conduct business in Michigan; at all times pertinent hereto, defendants UM Health and/or Metropolitan Hospital did business as "*Metro Health*" (collectively referred to hereinafter as "*Metro Health*") and operated a hospital and Emergency Department in Wyoming, Kent County, Michigan, and, at all times material, is a "*participating hospital*" as defined by 42 U.S.C.A. § 1395dd(e)(2) and so, subject to the provisions of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.A. § 1395dd and 42 C.F.R. § 489.24(b).

7.    Defendant Metro Health was and is a participating hospital within the meaning of Sec. 1866 of the Social Security Act and entered into a Medicare agreement under that Section of the Act. At all times pertinent hereto, Defendant

Metro Health was obligated to comply with Emergency Medical Treatment & Labor Act ("*EMTALA*") regulations, requirements, mandates, terms and conditions. In 1986, Congress enacted EMTALA to ensure public access to emergency services regardless of ability to pay. Section 1867 of the Social Security Act imposes specific obligations on Medicare-participating hospitals that offer emergency services to provide a medical screening examination ("*MSE*") when a request is made for examination or treatment for an emergency medical condition ("*EMC*"), including active labor, regardless of an individual's ability to pay. Hospitals are then required to provide stabilizing treatment for patients with EMCs. If a hospital is unable to stabilize a patient within its capability, or if the patient requests, an appropriate transfer should be implemented. Hospitals must make sure the patient is provided with stabilizing treatment (within the capabilities of the hospital's staff and facilities) before they can initiate a transfer to another hospital or medical facility or before they can discharge the patient. EMTALA provides that any individual who presents to a covered hospital's emergency department and requests examination or treatment shall be provided an appropriate medical screening examination to determine if an emergency medical condition exists. If an emergency medical condition is found to exist, the hospital must offer either stabilizing treatment or an appropriate transfer to another hospital that has the capabilities to provide stabilizing treatment.

8.     At all times pertinent, defendant Metro Health had substantial contacts with and/or regularly conducted business in Wyoming, Michigan. At all times pertinent, its staff, physicians, health-care providers, independent contractors,

representatives, agents, servants, and/or employees, including, but not limited to, the agents of Certified Emergency Medicine Specialists, P.C., Marc A. Afman, ("*Afman*") and/or Shane Menzies, ("*Menzies*"), attended to, diagnosed, examined, delivered and/or provided professional health care services to, and/or treated Mr. Rimmer in their professional capacities in defendant Metro Health's hospital Emergency Department in Wyoming, Michigan, and thereby established professional health-care/patient relationships with him.

<u>*PRÉCIS OF CASE*</u>
<u>*FACTUAL ALLEGATIONS*</u>

9.      Plaintiff incorporates by reference paragraphs 1—8 above, as though fully stated herein, paragraph by paragraph and word for word.

10.     In the early morning hours of April 11, 2021, Bobby Lee Rimmer ("*Mr. Rimmer*"), only 50 years old, presented with **multiple *<u>emergency medical conditions</u>*** to defendant Metro Health, *<u>requesting an examination and treatment for such medical conditions</u>*.



***Metro Health***

11.     Mr. Rimmer presented to the hospital Emergency Department at defendant Metro Health with complaints of shortness of breath that started a week prior and that worsened with physical exertion. Further, Mr. Rimmer complained of a productive cough, nausea, vomiting, and chest pain that started 3 days earlier.

12.     On April 11, 2021, Mr. Rimmer presented to defendant Metro Health's emergency department in Wyoming, Michigan and came under the care of emergency medicine *physician-in-training*, Shane Allen Menzies ("*Menzies*") and emergency medicine physician Marc Allyn Afman ("*Afman*"), who were agents, servants, and/or employees of defendant Metro Health.


*Menzies*


*Afman*

13.     Menzies and/or Afman noted Mr. Rimmer's active history of left ventricular hypertrophy due to hypertensive disease.[1] Additionally, Menzies and/or

---

[1] The left ventricle is the main chamber of your heart. It is responsible for pumping oxygen-rich blood into the aorta (the largest artery in the body). If the heart has to work too hard to pump blood, the muscles in the walls of the left ventricle thicken. This thickening is called hypertrophy. Hypertrophy means growing (trophy) too much (hyper). Left ventricular hypertrophy (LVH) makes it harder for the heart to pump blood efficiently. It can result in a lack of oxygen to the heart muscle. It can also cause changes to the heart's conduction system that make it beat irregularly (arrhythmia). Left ventricular

Afman performed and completed a MSE of Mr. Rimmer. The MSE disclosed that, in fact, several EMCs existed, *vide infra*. As such, defendant Metro Health was required to provide Mr. Rimmer with stabilizing treatment (within the capabilities of the defendant Metro Health's staff and facilities) before it could discharge Mr. Rimmer, or before it could initiate a transfer to another hospital or medical facility. Defendant Metro Health never stabilized Mr. Rimmer.

14. Upon examination, Menzies and/or Afman noted that Mr. Rimmer had left lower extremity swelling with 2+ pitting edema.

**Cardiac**: Tahcycardic with regular rhythm. No murmur. 2+ pitting edema in left lower extremity

15. Of note, pitting edema is a cardinal sign of congestive heart failure, which is an EMC, *i.e.*, a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in *a)* placing an individual's health in serious jeopardy, *b)* serious impairment to bodily functions; or *c)* serious dysfunction of any bodily organ (e.g., the heart) or part.[2] Menzies and Afman noted and recognized the presence of pitting edema but did not adequately discover its cause and did not stabilize the edema, prior to discharging Mr. Rimmer.

---

hypertrophy usually occurs as a result of other heart problems. Together, they can raise the risk of serious complications. Left untreated, LVH affects the heart's ability to pump blood efficiently. These changes increase the risk of other cardiac issues, including: arrhythmia, heart attack, heart failure, and/or stroke. Treating the underlying causes of left ventricular hypertrophy will help stop or slow disease progression. This can include: blood pressure medication, heart valve surgery, and/or lifestyle changes. *https://my.clevelandclinic.org/health/diseases/21883-left-ventricular-hypertrophy*
Unfortunately, Menzies and Afman **did not** prescribe Mr. Rimmer with any blood pressure medication to stabilize his BP, **did not** recommend lifestyle changes, and/or **did not** consult cardiology for Mr. Rimmer's heart conditions.
[2] *ROLAND, J., (peer reviewed by DR. PAYAL KOHLI, M.D., FACC), Healthline – What is the Connection Between Heart Failure and Edema? June 7, 2021.*

16.    Mr. Rimmer was also noted to have an elevated blood pressure (BP) of **147/93**, heart rate of **118**, was tachycardic with reported chest pain and found to have cardiomegaly.[3]

## Pressure is elevated 147/93 and heart rate is 118

| BLOOD PRESSURE CATEGORY | SYSTOLIC mm Hg (upper number) | and/or | DIASTOLIC mm Hg (lower number) |
|---|---|---|---|
| NORMAL | LESS THAN 120 | and | LESS THAN 80 |
| ELEVATED | 120 – 129 | and | LESS THAN 80 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 1 | 130 – 139 | or | 80 – 89 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 2 | 140 OR HIGHER | or | 90 OR HIGHER |
| HYPERTENSIVE CRISIS (consult your doctor immediately) | HIGHER THAN 180 | and/or | HIGHER THAN 120 |

17.    In the presence of multiple acute cardiac symptoms, (chest pain, elevated BP/hypertensive disease, lower extremity swelling, tachycardia, cardiomegaly, and left ventricular hypertrophy, which, together or individually,

---

[3] Cardiomegaly means enlargement of the heart. As the enlarged heart goes undiagnosed and untreated, the condition worsens and carries a high mortality rate. Enlargement of the heart is prevalent in nearly 5.8 million people in the United States and typically leads to a spectrum of clinical heart failure syndromes. *Amin, Hina & Siddiqui, Waqas. National Library of Medicine – Cardiomegaly. Nov. 20, 2022.*

constitute an EMC), diagnostics and timely treatment **must** be performed and instituted immediately to stabilize these life-threatening cardiac conditions. This includes, but is not limited to, echocardiogram and B-type natriuretic peptide (BNP) testing to aid in the stabilization of Mr. Rimmer's cardiac symptoms and heart failure.

18.     Further, due to Mr. Rimmer's complaints of chest pain and history of hypertension, studies should have been ordered to rule out myocardial infarction. These studies include, but are not limited to, an EKG or troponin lab. If the Emergency Department was not able to order these studies, a cardiology consultation should have been ordered "*STAT*," to properly work-up, treat and stabilize Mr. Rimmer's abnormal heart condition.

19.     However, defendant Metro Health **FAILED** to order or perform **ANY** cardiac studies to rule out congestive heart failure or myocardial infarction and/or **FAILED** to order a stat cardiology consult so that Mr. Rimmer's cardiac condition could be properly worked up, identified, treated, and stabilized.

20.     In fact, defendant Metro Health **did not** address and stabilize **ANY** of Mr. Rimmer's deadly cardiac conditions prior to discharging him home. ***This was a fatal error***.

21.     Mr. Rimmer's last reported blood pressure was **132/95**, with a heart rate of **118**, indicating that he was ***still tachycardic and hypertensive at the time of discharge, and by definition, unstable***.[4] The failure to stabilize Mr. Rimmer

---

[4] 60 to 100 beats per minute is the healthy range.

placed his health in serious jeopardy, and would likely result in serious impairment to his bodily functions; or serious dysfunction of his heart and lungs.

**Last Filed Vital Signs** - documented in this encounter

| Vital Sign | Reading | Time Taken |
|---|---|---|
| Blood Pressure | 132/95 | 04/11/2021 4:00 AM EDT |
| Pulse | 118 | 04/11/2021 1:11 AM EDT |

22.    During this same Emergency Room visit, on April 11, 2021, Mr. Rimmer also presented with shortness of breath and a respiratory rate of **22**.[5] Mr. Rimmer's initial oxygen saturation was **93%** (lower than the healthy range of 95%-100%) and his hemoglobin level was **7.1**.[6]

23.    Based on these labs, Mr. Rimmer was diagnosed with iron deficiency anemia **which significantly decreases the body's ability to oxygenate itself**. Further, Mr. Rimmer's fecal blood test was positive, which supports the diagnosis of an ***active gastrointestinal hemorrhage***. Iron deficiency anemia and gastrointestinal hemorrhage were EMCs which were not stabilized and resulted in Mr. Rimmer's death.

24.    Because of these severe and acute respiratory, pulmonary, and cardiac EMCs, Mr. Rimmer should have been stabilized by immediate admission to the

---

[5] Recent evidence has shown that patients with a respiratory rate **over 20 beats per minute are likely unwell and require frequent vital monitoring**. *Cretikos, Michelle et al. The Medical Journal of Australia – Respiratory rate: the neglected vital sign. June 2, 2008.* Instead of admitting Mr. Rimmer for frequent monitoring of his vitals, defendant Metro Health sent Mr. Rimmer home. **This was another deadly mistake.**

[6] For an adult male, normal hemoglobin levels range from 14-18 gm/dL. A low hemoglobin level is referred to as anemia or low red blood count. Generally, **the threshold for needing a blood transfusion is a hemoglobin level below 8 gm/dL, but recently, experts suggest a transfusion is required with hemoglobin levels below 9 gm/dL**. *Franchini, Massimo, et al. PubMed Central – Red blood cell transfusion policy: a critical literature review. 2017 July; 15(4): 307-317.* **Mr. Rimmer's hemoglobin was 7.1, well below the threshold for requiring a blood transfusion.** However, **NO** transfusion was performed. **This was yet another deadly mistake.**

hospital for a blood transfusion, constant monitoring of his vitals for his low respiratory rate, consultation with a gastrointestinal specialist, and treatment of his likely gastrointestinal hemorrhage.

25.     Instead of stabilizing and/or admitting Mr. Rimmer, Metro Health sent Mr. Rimmer home to die; it **did not** stabilize Mr. Rimmer with a blood transfusion, **did not** administer and/or order oxygen therapy, **did not** order breathing treatments, **did not** increase Mr. Rimmer's low hemoglobin level before discharging him home, and **did not** consult gastroenterology. ***These were lethal errors***.

26.     **NONE** of Mr. Rimmer's respiratory conditions were stabilized before defendant Metro Health sent him home.

27.     This egregious absence of patient stabilization directly contributed to Mr. Rimmer's untimely demise.

28.     Further, on April 11, 2023, Mr. Rimmer also presented with an elevated white blood cell count of **19,700**/mm$^3$, increased respiratory rate of **22**, a platelet count of **764**, and an elevated (tachycardic) heart rate of **121**.

| Labs Reviewed | |
|---|---|
| CBC WITH DIFF - Abnormal; Notable for the following components: | |
| Result | Value |
| WBC | 19.7 (*) |
| RBC | 2.41 (*) |
| HEMOGLOBIN | 7.1 (*) |
| HEMATOCRIT | 22.3 (*) |
| RDW | 17.0 (*) |
| PLATELET COUNT | 764 (*) |
| NEUTROPHILS ABS | 17.2 (*) |
| ANISOCYTOSIS | 2+ (*) |
| POLYCHROMASIA | 1+ (*) |

| | | |
|---|---|---|
| Pulse | 04/11/21 0006 | 121 |
| Pleth Heart Rate | 04/11/21 0133 | 125 beats/min |
| Resp | 04/11/21 0006 | 22 |
| BP | 04/11/21 0006 | 118/81 |

29.    These values established that Mr. Rimmer met the major criteria for SIRS (systemic inflammatory response syndrome), yet another EMC that defendant Metro Health did not stabilize. A chest x-ray confirmed Mr. Rimmer's diagnosis of pneumonia and bibasilar pulmonary consolidation, two other EMCs which defendant Metro Health did not stabilize.[7]

---

[7] Bibasilar pulmonary consolidation and/or bibasilar atelectasis is the collapse of the lower lobes of both lungs. Symptoms include wheezing, shortness of breath, a wet cough, and rapid, shallow breathing, (as Mr. Rimmer had, here). Treatment may involve breathing exercises, chest percussions, postural drainage, positive-end expiratory pressure, and/or airway clearance/suctioning. Medical treatment to remove the clearance of mucus can include: bronchodilators and/or mucolytic agents. **The outlook is generally good with the appropriate treatment**. Unfortunately, Menzies and/or Afman failed to admit Mr. Rimmer for treatment of his bibasilar pulmonary consolidation. ***This was a deadly mistake.***



Pneumonia of both lower lobes due to infectious organism (primary)          Yes

30.    At this point, Mr. Rimmer had clearly met the criteria for a sepsis infection (an EMC) and he should have been admitted ***immediately to stabilize him***.[8]

8 Sepsis is a life-threatening organ dysfunction caused by the body's inflammatory response to an infectious host. Early detection and **TIMELY INTERVENTION** have the greatest impact on reducing mortality. *Srzic, Ivana, et al. National Library of Medicine – Sepsis Definition: What's New in the Treatment Guidelines. June 2022; 61 (Suppl 1): 67-72.*

13

31.     Due to Mr. Rimmer's heart rate of **121**, respiratory rate of **22**, white blood cell count of **19,700**/mm$^3$, platelet count of **764**, and diagnoses of pneumonia and bibasilar pulmonary consolidation, Mr. Rimmer **HAD** a sepsis infection and should have been admitted into the hospital **IMMEDIATELY** to stabilize these EMCs. He was not admitted nor stabilized.

32.     The most common and effective way to stabilize a sepsis patient like Mr. Rimmer is to administer a one-hour sepsis bundle, as demonstrated below.



33.     At the bare minimum, on April 11, 2021, defendant Metro should have **IMMEDIATELY** admitted Mr. Rimmer to its hospital so that his multiple EMCs could be properly stabilized, and so that antibiotics could be timely administered to quickly stabilize his pneumonia and deadly sepsis infection.

34.     However, defendant Metro Health **did not** do **ANYTHING** to acutely stabilize Mr. Rimmer's sepsis infection.

35.   **NO** antibiotics were administered to Mr. Rimmer while he was at defendant Metro Health, despite the presence of severe sepsis (an EMC) requiring **IMMEDIATE** intervention.

36.   Further, on April 11, 2021, Mr. Rimmer had the hallmark signs and symptoms of acute kidney disease, an EMC.[9] Mr. Rimmer's low electrolyte values including low potassium of **2.8**, low sodium of **131**, low chloride of **89**, and low calcium of **7.7**, as well as a high creatine of **1.731**, required stabilization. Metro Health did nothing in this regard.[10]

**Components**

| Component | Value | Reference Range | Flag | Lab |
|---|---|---|---|---|
| GLUCOSE | 104 | 70 - 105 mg/dL | — | Main Lab |
| BLOOD UREA NITROGEN | 20 | 7 - 25 mg/dL | — | Main Lab |
| CREATININE | 1.731 | 0.900 - 1.300 mg/dL | H ^ | Main Lab |
| SODIUM | 131 | 136 - 145 mmol/L | L ˅ | Main Lab |
| POTASSIUM | 2.8 | 3.5 - 5.1 mmol/L | L | Main Lab |
| CHLORIDE | 89 | 98 - 107 mmol/L | L ˅ | Main Lab |
| CARBON DIOXIDE | 22.0 | 21.0 - 32.0 mmol/L | — | Main Lab |
| CALCIUM | 7.7 | 8.6 - 10.3 mg/dL | L ˅ | Main Lab |

37.   Specifically, stabilization would have consisted of urinalysis, examination of the urinary sediment, and imaging studies at a minimum, with additional testing, among other things.

---

[9] Acute kidney injury (AKI) is a syndrome characterized by a rapid (hours to days) deterioration of kidney function. It is often diagnosed in the context of other acute illnesses. Rapid diagnosis and appropriate diagnostic workup are essential to identify those types of AKI where specific therapies and interventions are available to reverse the injurious process within the kidneys. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5037640/

[10] The normal range for electrolyte lab measures include the following: Sodium: 136 to 144 mmol/L; Potassium: 3.7 to 5.1 mmol/L; Calcium: In adults, 8.5 to 10.2 mg/dL; Chloride: 97 to 105 mmol/L; Magnesium: 1.7 to 2.2 mg/dL; Phosphate: 2.5 to 4.8 mg/dL; Bicarbonate: 22 to 30 mmol/L.



38.    The above algorithm details what diagnostic testing should be done when acute kidney infection is suspected, so that proper treatment can be administer to stabilize a sick patient like Mr. Rimmer. Of note, particularly because Mr. Rimmer also had all of the major indications of sepsis, stabilization of both acute kidney infection and sepsis was imperative to save his life.

39.    However, defendant Metro Health **did not** stabilize or otherwise treat Mr. Rimmer's acute kidney disease and/or sepsis after reviewing Mr. Rimmer's concerning labs which disclosed these EMCs, and/or **did not** admit Mr. Rimmer to the hospital and consult a nephrologist so that Mr. Rimmer's acute kidney disease could be properly treated and stabilized. ***This was a deadly mistake***.

40.    After only an hour and 15 minutes at the hospital, defendant Metro Health discharged Mr. Rimmer. Defendant Metro Health's MSE did disclose several EMCs, including pneumonia of both lower lobes due to infectious organism, bibasilar pulmonary consolidation, pitting edema 2+, iron deficiency anemia, a gastrointestinal hemorrhage, hypokalemia, and shortness of breath, which together or separately were conditions of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in *a)* placing Mr. Rimmer's health in serious jeopardy, *b)* serious impairment to his bodily functions; or *c)* serious dysfunction of his bodily organs (e.g., the heart, lungs, kidneys)

**CLINICAL IMPRESSION**
1.    Pneumonia of both lower lobes due to infectious organism
2.    Iron deficiency anemia, unspecified iron deficiency anemia type
3.    Gastrointestinal hemorrhage, unspecified gastrointestinal hemorrhage type
4.    Hypokalemia
5.    Shortness of breath

41.    At the time of his presentation to defendant Metro Health, Mr. Rimmer was also suffering from sepsis, hyponatremia, uncontrolled hypertension, acute kidney disease, and unresolved tachycardia, which together or separately were conditions of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in *a)* placing Mr. Rimmer's health in serious jeopardy, *b)* serious impairment to his bodily functions; or *c)* serious dysfunction of his bodily organs (e.g., the heart, lungs, kidneys).

42.    Despite these multiple life-threatening conditions, defendant Metro Health **did not** admit Mr. Rimmer to the hospital for stabilization and treatment of

his medical conditions. Instead, defendant Metro Health tossed Mr. Rimmer a couple of Motrin and omega 3 fish oil pills and dumped him to the curb.

43.     Defendant Metro Health did this while expressly recognizing the seriousness of Mr. Rimmer's unstable vital signs but **did not** admit him to the hospital for stabilization.

to follow-up with a primary care ph
**I stressed the seriousness of this,**

44.     Defendant Metro Health blatantly disregarded Mr. Rimmer's signs and symptoms of numerous EMCs, which included left ventricular hypertrophy due to hypertensive disease; left lower extremity swelling with 2+ pitting edema; congestive heart failure (evidenced by the number of issues Mr. Rimmer was having); elevated labs, vitals, and blood pressure; tachycardia; active gastrointestinal hemorrhage; pneumonia of both lower lobes due to infectious organism; bibasilar pulmonary consolidation; sepsis infection; and acute kidney disease, and did not stabilize any of them prior to discharge.

45.     Defendant Metro Health illegally discharged Mr. Rimmer without properly stabilizing his EMCs, and/or admitting him to the hospital for further treatment.

46.     As expected, due to defendant Metro Health's **FAILURE** to stabilize Mr. Rimmer's EMCs prior to discharge or transfer him to another facility adequately equipped to handle Mr. Rimmer's care and treatment, **Mr. Rimmer was sent home to die**.

47.     Unfortunately, **less than 10 HOURS** after defendant Metro Health impermissibly discharged Mr. Rimmer, Mr. Rimmer was pronounced deceased in his own home. Mr. Rimmer was only 50 years old at the time of death and left behind his wife, two daughters, a son, and 12 loving grandchildren.



48.     Had defendant Metro Health stabilized him prior to discharge, Mr. Rimmer would have survived and not died on April 11, 2017.

49.     The EMTALA statute required "*such treatment as may be required to stabilize the medical condition*," 42 U.S.C. § 1395dd(b), and forbade Mr. Rimmer's release unless his condition had "*been stabilized*," 42 U.S.C. § 1395dd(c)(1). A patient with an emergency medical condition is "*stabilized*" when "*no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during*" the patient's release from the hospital. 42 U.S.C. § 1395dd(e)(3)(B). Thus, EMTALA required defendant Metro Health to provide Mr. Rimmer with such treatment as was required to stabilize his multiple EMCs in such a way that, upon his release, no further deterioration of the conditions was likely. In the case of Mr. Rimmer's EMCs, it is unreasonable to believe that such stabilization could be accomplished by merely flipping him some Motrin and fish oil supplements.

<u>**COUNT I**</u>
<u>*VIOLATIONS OF THE EMERGENCY MEDICAL*</u>
<u>*TREATMENT AND ACTIVE LABOR ACT (EMTALA)*</u>

50.     Plaintiff incorporates by reference paragraphs 1—49 above as though fully stated herein, *paragraph-by-paragraph* and *word-for-word*.

51.     At all relevant times, Mr. Rimmer was an individual within the meaning of 42 USC §1395dd (b)(1).

52.     On April 11, 2021, Mr. Rimmer came to defendant Metro Health's Emergency Department and hospital and **<u>requested an examination and/or treatment for multiple emergency medical conditions</u>**.

53.     At the time of arrival and during his time at defendant Metro Health's Emergency Department and hospital on April 11, 2021, Mr. Rimmer was suffering from multiple emergency medical conditions, *e.g., left ventricular hypertrophy due to hypertensive disease; left lower extremity swelling with 2+ pitting edema; congestive heart failure; elevated labs, vitals, and blood pressure; tachycardia; active gastrointestinal hemorrhage; pneumonia of both lower lobes due to infectious organism; bibasilar pulmonary consolidation; sepsis infection; and acute kidney disease*, manifesting by **<u>acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in placing his health in serious jeopardy, serious impairment to bodily functions, and/or serious dysfunction of a bodily organ or part, thereby constituting an emergency medical condition</u>** within the meaning and definition of and/or pursuant to 42 USC 42 USC §1395dd(b)(1), dd(e)(1).

54.    Defendant Metro Health operated its hospital and Emergency Department within the meaning of and/or pursuant to 42 USC §1395dd(b)(1); dd(e)(2) and/or (5) and further, pursuant to 42 USC §1395dd(b)(1)(A),(B); dd(e)(3)(A) was obligated and required to ***stabilize*** Mr. Rimmer's emergency medical conditions, ***i.e., to provide him such medical treatment of his conditions as necessary to assure, within a reasonable degree of medical probability, that no material deterioration of the conditions was likely to result from or occur during her transfer from its facility.*** Defendant Metro Health held itself out as having the ability to ***stabilize*** an individual in Mr. Rimmer's condition. Defendant Metro Health did not ***stabilize*** Mr. Rimmer's emergency medical conditions before discharging him, as required by **EMTALA**, and as a direct consequence and result, he suffered injury and damages, leading to his untimely demise **less than 10 hours later**. Defendant's failure to stabilize Mr. Rimmer's condition within the capabilities of its Emergency Department, including its staff, facilities, and ancillary services, was a clear violation of 42 USC § 1395dd(b)(1).

55.    As a proximate result of defendant Metro Health's failure to stabilize Mr. Rimmer on April 11, 2021 prior to discharge, his EMCs wrongfully deteriorated, resulting in Mr. Rimmer's untimely death, hours later.

56.    Pursuant to 42 USC §1395dd(b)(1)(B), dd(c), dd(e) and under the circumstances of this case, defendant Metro Health was legally required to either stabilize Mr. Rimmer's EMCs or properly ***transfer*** Mr. Rimmer on April 11, 2021. Instead, it improperly ***discharged*** him, prior to stabilization. This constituted an

improper ***transfer*** as defined and required by 42 USC §1395dd(b)(1)(B), dd(c)(2), and dd(e)(4). Mr. Rimmer's emergency medical conditions were not ***stabilized*** before discharge on April 11, 2021. As a direct consequence and result of defendant Metro Health's failure to effect an appropriate ***discharge*** as defined and required by **EMTALA**, Mr. Rimmer was improperly discharged in an ***unstable condition***, suffered injuries and damages, and died as a result.

57.     Defendant Metro Health, which should have perceived and appreciated the gravity of Mr. Rimmer's EMCs, did not stabilize said conditions within the capabilities of the Emergency Department, including its staff, facilities, and ancillary services, in violation of 42 U.S.C.A. § 1395dd(b)(1).

58.     As a proximate result of defendant Metro Health's failure to stabilize Mr. Rimmer on April 11, 2021, Mr. Rimmer was discharged and his EMCs wrongfully and unlawfully were allowed to deteriorate, eventually resulting in cardio-pulmonary arrest and Mr. Rimmer's demise and death on April 11, 2021.

59.     As a proximate result of defendant Metro Health's failure to stabilize Mr. Rimmer on April 11, 2021, Mr. Rimmer suffered cardio-pulmonary arrest and died.

60.     As a proximate result of defendant Metro Health's failure to stabilize Mr. Rimmer on April 11, 2021, Mr. Rimmer wrongfully and unlawfully sustained injuries resulting in his death on April 11, 2021, and in consequence of Mr. Rimmer's death, Plaintiff, as the Personal Representative of Mr. Rimmer's Estate and on behalf of the beneficiaries, heirs-at-law and next-of-kin thereof, brings claims for damages

and losses recoverable under the Michigan common law and Michigan Compiled Laws §§ 600.2922 and 600.2921, *vide infra.*

61. Prior to discharge, on April 11, 2021, defendant Metro Health:

a) *DID NOT to do everything within its capabilities to minimize the risks to Mr. Rimmer's health;*

b) *DID NOT arrange for another hospital to accept Mr. Rimmer in transfer;*

c) *DID NOT send appropriate data regarding Mr. Rimmer to an accepting hospital facility;*

d) *DID NOT effect Mr. Rimmer's transfer through qualified personnel and transport services;*

e) *DID NOT re-assess Mr. Rimmer at the time of discharge to confirm whether or whether not his EMCs were stabilized or whether he should be appropriately transferred;*

f) *DID NOT inform Mr. Rimmer of its obligations under EMTALA and the risks of premature discharge;*

g) *DID NOT provide treatment until Mr. Rimmer was stabilized, or if it did not have the capability, transfer Mr. Rimmer to another hospital;*

h) *IMPROPERLY DISCHARGED Mr. Rimmer without formulating a plan for subsequent outpatient medical treatment consistent with medical routine that would not jeopardize Mr. Rimmer's health;*

i) *Other violations as shall be revealed in discovery.*

62. Defendant Metro Health failed to post signs at or in its hospital and Emergency Department which specified the rights of individuals with respect to examination for emergency medical conditions and which specified its obligations and the rights of individuals under **EMTALA** and which indicated whether they participate in the Medicare and Medicaid programs, all as required by **EMTALA**. Defendant Metro Health's conduct and actions outlined above posed an immediate

and serious threat to the health, safety and welfare of defendant Metro Health's patients and the general public.

63.    Defendant Metro Health's violations of **EMTALA**, as outlined above, are a direct and proximate cause of Mr. Rimmer's untimely death, entitling his Estate to damages and equitable relief as appropriate.

**WHEREFORE**, Plaintiff requests that this Court or Jury:

A.    Enter judgment or award against the Defendant in the amount of **TWENTY-FIVE MILLION DOLLARS** ($25,000,000.00) or whatever is appropriate to compensate the Estate of Bobby Lee Rimmer, *deceased*, for the death so wrongfully sustained as a result of Defendants' violations of **EMTALA**, together with interest, court costs, and attorney fees;

B.    Grant equitable relief, as appropriate, including but not limited to an order to the Secretary of Health and Human Services to request an appropriate utilization of quality control peer review of the conduct of Defendant with regard to the treatment received by Mr. Rimmer and with regard to the treatment of all patients in Defendant's Emergency Department whose health, safety and welfare may be jeopardized by the conduct exemplified by the treatment received by Mr. Rimmer.

## COUNT II
### *INJURIES / DAMAGES*

64.    Plaintiff incorporates by reference paragraphs 1—63 above, as though fully stated herein, *paragraph-by-paragraph* and *word-for-word*.

65. As a direct and proximate result and consequence of defendant Metro Health's **EMTALA** violations, Mr. Rimmer was prematurely discharged from defendant Metro Health's Emergency Department with ***multiple emergency medical conditions that were not stabilized***, resulting in Mr. Rimmer's untimely death less than 10 hours later.

66. Mr. Rimmer's Estate demands exemplary damages to compensate it for the humiliation, sense of outrage, and indignity resulting from injuries which were maliciously, willfully, and wantonly inflicted upon it and Mr. Rimmer by Defendants.

67. As a direct and proximate result of the breaches of the standards of care committed by defendant Metro Health, and its failure to comply with the same, Mr. Rimmer:

  *a.* *Was disabled and forced to suffer impaired strength;*
  *b.* *Had life expectancy shortened and/or lost the opportunity and/or chance to survive;*
  *c.* *Suffered a great deal of mental pain and anguish;*
  *d.* *Suffered emotional distress, harm, personal injury, and severe physical and mental pain and suffering;*
  *e.* *Suffered a permanent loss of health, loss of enjoyment of life, loss of quality of life, loss of enjoyment of life activities and loss of the ability to lead life as a whole, and died on April 11, 2021.*

68. In accordance with the provisions of Michigan Compiled Laws § 600.2922, a *wrongful death action* has accrued to the Estate of Bobby Lee Rimmer, *deceased*. In accordance with Michigan Complied Laws § 600.2921, a *survival action* has accrued to the Estate of Bobby Lee Rimmer, *deceased*. In accordance with the provisions of Michigan's Wrongful Death Act and/or Survival Statute, the Estate of

Bobby Lee Rimmer, *deceased*, is entitled to certain damages including, but not limited to:

    a.     *Reasonable compensation for funeral, burial, medical, and hospital expenses for which the Estate is responsible;*

    b.     *Reasonable compensation for the pain and suffering undergone by Bobby Lee Rimmer, during the intervening period of time from the initial injury until death;*

    c.     *Reasonable compensation for injuries and damages resulting from the death of Bobby Lee Rimmer to beneficiaries, heirs-at-law and next-of-kin to compensate for the damages and loss of support and maintenance, services, gifts, and other valuable gratuities, and other damages herein mentioned as may be fair and just;*

    d.     *Damages for the loss of the continued love, society, companionship, consortium, comfort, affection, fellowship, parental training and guidance, aid, and other assistance which Bobby Lee Rimmer's beneficiaries, heirs-at-law and next-of-kin are respectfully entitled to and other damages as may be fair and just;*

    e.     *Reasonable compensation for loss of earnings and loss in household services;*

    f.     *Any and all damages that Bobby Lee Rimmer would have been able to recover had Bobby Lee Rimmer lived (i.e., <u>any</u> type of damages, economic and noneconomic, including lost wages and loss of potential earnings), in accordance with MCL § 600.2922 (1), 600.2922 (6), THORN vs MERCY MEMORIAL HOSP. CORP., 281 Mich.App. 644, 761 N.W.2d 414 (2008), KOONTZ vs AMERITECH SERVICES, INC., 466 Mich. 304, 312, 645 N.W.2d 34 (2002); DLF TRUCKING INC. vs BACH, 268 Mich.App. 306, 310–311, 707 N.W.2d 606 (2005); SHINHOLSTER vs ANNAPOLIS HOSP., 471 Mich. 540, 685 N.W.2d 275 (2004); JENKINS vs PATEL, 471 Mich. 158, 684 N.W.2d 346 (2004); IN RE HAQUE, 237 Mich.App. 295, 306, 602 N.W.2d 622 (1999); WESCHE vs MECOSTA CO. RD. COMM., 480 Mich. 75, at 88, 746 N.W.2d 847 (2008), HARDY vs MAXHEIMER, 429 Mich. 422, 416 N.W.2d 299 (1987); HAWKINS vs REGIONAL MEDICAL LABORATORIES, PC, 415 Mich. 420, 434, 329 N.W.2d 729 (1982). WILSON vs MODERN MOBILE HOMES,*

*Inc., 376 Mich. 342, 137 N.W. 2d 144 ( 1965); Currie vs Fiting, 375 Mich. 440, 134 N.W.2d 611 (1965); Wycko vs Gnodtke, 361 Mich. 331, 105 N.W.2d 118 (1960); Rohm vs Stroud, 386 Mich 693, 194 N.W.2d 307 (1972);*

    g.    *Other damages as may be allowable, fair, just, permitted and recoverable by law.*

### Et Inde Petit Judicium

**WHEREFORE**, the plaintiff **GLORIA BAILEY**, *Personal Representative of the Estate of* **BOBBY LEE RIMMER**, *deceased*, herein prays that this Court or Jury award compensatory damages against defendants **UM HEALTH**, *d/b/a Metro Health, Metro Health Corporation, and/or Metro Health – University of Michigan Health*, AND **METROPOLITAN HOSPITAL,** *a/k/a and d/b/a Metro Health, Metro Health – University of Michigan Health, Metro Health Hospital, UMH-West – Hospital, and/or University of Michigan Health – West, jointly and severally*, in the amount of **TWENTY-FIVE MILLION DOLLARS** ($25,000,000), or in an amount that shall fairly compensate the Estate of **BOBBY LEE RIMMER,** *deceased*, for the injuries, losses, and damages wrongly inflicted upon Mr. Rimmer and his Estate by Defendants, plus costs, interest, attorney fees, and other relief as is fair, just, and equitable under the circumstances.

**JEFFERSON LAW CENTER**

BY:   */s/ Albert J. Dib*

    ALBERT J. DIB, ESQ. (P32497)
    LEANNE PREGIZER (P83777)
    *Attorneys for Plaintiff*
    JEFFERSON LAW & FINANCE BLDG
    25615 Jefferson
    St. Clair Shores, MI 48081-2310

(586) 270-4010 FAX: 4011
(248) 672-9854 [MOBILE]
adib@jeffersonlawcenter.com
lpregizer@jeffersonlawcenter.com
DATED: August 1, 2023                  www.jeffersonlawcenter.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| GLORIA BAILEY, *Personal Representative* *of* THE ESTATE OF BOBBY LEE RIMMER, *deceased,* | ) ) ) ) | |
| PLAINTIFF, | ) ) | CIVIL ACTION NO. |
| | ) | |
| *-vs-* | ) ) | HON. MAGISTRATE |
| UM HEALTH, *d/b/a Metro Health, Metro Health Corporation, and/or Metro Health – University of Michigan Health,* AND METROPOLITAN HOSPITAL, *a/k/a and d/b/a Metro Health, Metro Health – University of Michigan Health, Metro Health Hospital, UMH-West – Hospital, and/or University of Michigan Health – West, Jointly and Severally,* | ) ) ) ) ) ) ) ) ) | |
| DEFENDANTS. | ) ) | |

_____

ALBERT J. DIB, ESQ. (P32497)
LEANNE PREGIZER (P83777)
**JEFFERSON LAW CENTER**
*Attorneys for Plaintiff*
JEFFERSON LAW & FINANCE BLDG
25615 Jefferson Ave.
St. Clair Shores, MI 48081
(586) 270-4010; FAX: 4011
(248) 672-9854 [MOBILE]
adib@jeffersonlawcenter.com
lpregizer@jeffersonlawcenter.com
www.jeffersonlawcenter.com

## JURY DEMAND

Plaintiff herein, **GLORIA BAILEY**, *Personal Representative of the Estate of* **BOBBY**

**LEE RIMMER,** *deceased,* by and through her attorneys, JEFFERSON LAW CENTER, *by*:

ALBERT J. DIB, *Attorney/Director*, hereby demands a TRIAL BY JURY pursuant to

Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution.

JEFFERSON LAW CENTER

BY:    */s/ Albert J. Dib*

ALBERT J. DIB, ESQ. (P32497)
LEANNE PREGIZER (P83777)
*Attorneys for Plaintiff*
JEFFERSON LAW & FINANCE BLDG
25615 Jefferson
St. Clair Shores, MI 48081-2310
(586) 270-4010 FAX: 4011
(248) 672-9854 [MOBILE]
adib@jeffersonlawcenter.com
lpregizer@jeffersonlawcenter.com
DATED: August 1, 2023          www.jeffersonlawcenter.com